COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA B. BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
Email: marco@coastlaw.com

Attorneys for Plaintiff
COASTAL ENVIRONMENTAL RIGHTS FOUNDATION

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>WATKINS MANUFACTURING CORPORATION, a California corporation,<br><br>Defendant. | Civil Case No.: '18 CV0555 GPC KSC<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

Coastal Environmental Rights Foundation, ("CERF" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On March 10, 2017, Plaintiff issued a 60-day notice letter ("Notice Letter") to Watkins Manufacturing Corporation ("Watkins" or "Defendant") regarding its violations of the Clean Water Act, and of Plaintiff's intention to file suit against Defendant. The Notice Letter was sent to the registered agent for Watkins, as required by 40 C.F.R. § 135.2(a)(1), the Facility (1280 Park Center Drive, Vista, California), as well as the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, San Diego Region ("Regional Board") as required by CWA, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of the Notice Letter is attached hereto as Exhibit A and incorporated herein.

3.      More than sixty days has passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this complaint. (33 U.S.C. § 1365(b)(1)(B)). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are

located within this judicial district.

## II.   INTRODUCTION

5.      This complaint seeks relief for the Defendant's unlawful discharge of pollutants into waters of the United States from its operations at 1280 Park Center Drive, Vista, California ("Watkins Facility" or "Site"). Specifically, Defendant discharges storm water runoff from the Site into City of Vista storm drains, Agua Hedionda Creek, Agua Hedionda Lagoon, and ultimately the Pacific Ocean (collectively referred to as the "Receiving Waters"). This complaint also seeks relief for Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of California's General Permit for Discharges Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ*) ("Industrial Permit"). Defendant's violations of the Clean Water Act and the Industrial Permit are ongoing and continuous.

6.      With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Watkins Facility, flow into Vista storm drain systems, Agua Hedionda Creek, Agua Hedionda Lagoon, and ultimately the Pacific Ocean. This discharge of pollutants in storm water from industrial activities such as the Watkins Facility contributes to the impairment of downstream waters and compromises or destroys their beneficial uses.

## III.   PARTIES

### A.   Coastal Environmental Rights Foundation

7.      Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California.

8.      CERF's office is located at 1140 South Coast Highway 101, Encinitas California, 92024.

9.      CERF was founded by surfers in North San Diego County and active throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

10.     Plaintiff has thousands of members who live and/or recreate in and around Agua Hedionda Creek and Agua Hedionda Lagoon and the Pacific Ocean.

11.     Plaintiff's members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife, and engage in scientific study including monitoring activities, among other activities. Defendant discharges pollutants from the Site to the Receiving Waters and Defendant's discharges of stormwater containing pollutants impair each of these uses. Thus, Defendant's discharge of pollutants impairs Plaintiff's members' uses and enjoyment of the Receiving Waters.

12.     The interests of Plaintiff's members have been, are being, and will continue to be adversely affected by the Defendant's failure to comply with the Clean Water Act and the Industrial Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff's members, for which harm they have no plain, speedy or adequate remedy at law.

**B. The Watkins Facility Owners and/or Operators**

13.     Plaintiff is informed and believes that Watkins is a corporation organized under the laws of the State of California, and is located in Vista, California.

14.     Plaintiff is informed and believes that Watkins has owned and operated the Watkins Facility located at 1280 Park Center Drive, Vista, California, since at least April 7, 1992.

**IV.    STATUTORY BACKGROUND**

**A.      The Clean Water Act**

15.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the

discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

16.     Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p)). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342).

17.     Section 402(b) of the CWA allows each state to administer its own EPA-approved permit for storm water discharges. (33 U.S.C. § 1342(b)). In California, the State Board is charged with regulating pollutants to protect California's water resources.

18.     Section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable (BAT) for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology (BCT) for conventional pollutants.  See 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

19.     The Industrial Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. (33 U.S.C. § 1342).

20.     Section 505(a)(1) of the CWA provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation… or an order issued by the Administrator or a State with respect to such a standard or limitation." (33 U.S.C. § 1365(a)(1)). Watkins is a "person" within the meaning of section 502(5) of the Clean Water Act. 33 U.S.C. § 1362(5).

21.     An action for injunctive relief under the CWA is authorized by 33 U.S.C.

§ 1365(a).

22.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $51,570 per day for violations occurring after November 2, 2015 and up to $37,500 per day per violation for all violations occurring after January 27, 2009 and up to November 2, 2015. (33 U.S.C. § 1319(d); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §19.4).

23.     Section 505(d) of the Clean Water Act permits prevailing parties to recover costs, including attorneys' and experts' fees. (33 U.S.C. § 1365(d)).

**B.     California's Industrial Permit**

24.     The Industrial Permit, NPDES General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ is an NPDES permit adopted pursuant to Section 402 of the CWA, 33 U.S.C. § 1342(b) and 40 C.F.R § 123.25.  In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. The Industrial Permit as amended pursuant to Order No. 2014-0057-DWQ became effective July 1, 2015 ("New Industrial Permit").

25.     Failure to comply with the Industrial Permit or New Industrial Permit constitutes a Clean Water Act violation. (Industrial Permit, § C.1; New Industrial Permit §XXI.A.).

26.     Discharge Prohibitions A(1) of the Industrial Permit and III.B. of the New Industrial Permit prohibit the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibition A(2) of the Industrial Permit and III.C. of the New Industrial Permit prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance.

27.     Effluent limitations B(3) of the Industrial Permit and Sections I.D and

V.A. of the New Industrial Permit require facility operators to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

28.     Industrial Permit Receiving Water Limitation C(1) and New Industrial Permit Receiving Water Limitation VI.B. prohibit storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impacts human health or the environment.

29.     Industrial Permit Receiving Water Limitation C(2) and New Industrial Permit Receiving Water Limitation VI.A. prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

30.     Section A(1) and Provision E(2) of the Industrial Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A. and B. of the New Industrial Permit require development and implementation of site-specific SWPPPs by July 1, 2015 or upon commencement of industrial activity.

31.     The objective of the SWPPP is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Site and identify and implement site-specific Best Management Practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges. (Industrial Permit, Section A(2); New Industrial Permit, Section X.C.1).

32.     To ensure its effectiveness, the SWPPP must be evaluated on an annual basis, and it must be revised as necessary to ensure compliance with the Permit.

(Industrial Permit, Sections A(9), (10); New Industrial Permit, Sections XA. And X.B.1.).

33.     Sections A(3) through A(10) of the Industrial Permit and Sections X.A to X.I. of the New Industrial Permit set forth the requirements for a SWPPP.

34.     The SWPPP must include a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity. (Industrial Permit, Section A(4); New Industrial Permit, Section X.E.).

35.      Dischargers are also required to prepare and implement a monitoring and reporting program ("M&RP"). (Industrial Permit, Sections E(3), B(1); New Industrial Permit, Section XI).

36.     The objective of the M&RP is to ensure that BMPs have been adequately developed and implemented, revised as necessary, and to ensure that storm water discharges are in compliance with the Industrial Permit (up to July 1, 2015) and New Industrial Permit (July 1, 2015 and thereafter) Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (Industrial Permit, Section B(2); New Industrial Permit, Finding J.56).

37.     The Industrial Permit and New Industrial Permit require dischargers to conduct visual observations for the presence of unauthorized non-storm water discharges, to document the source of any discharge, and to report the presence of any discolorations, stains, odors, and floating materials in the discharge.

38.     The Industrial Permit and New Industrial Permit require dischargers to visually observe drainage areas during the wet season (October 1 - May 30) and to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants.

39.     Both the Industrial Permit and New Industrial Permit require dischargers to maintain records of observations, observation dates, locations observed, and

responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges.

40.     The Industrial Permit requires dischargers to collect a sample from all discharge points during the first storm event of the wet season and during at least one other storm event of the wet season, for a total of two samples per wet season. (Industrial Permit, Section (B)(5)). The New Industrial permit requires dischargers to collect and analyze storm water samples from two storm events with the first half of each reporting year (July 1 to December 31) and two from the second half (January 1 to June 30). (New Industrial Permit, Section XI.B.2.).

41.     Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

42.     Dischargers must submit "Annual Reports" to the Regional Board in July of each year. (Industrial Permit, Section B(14); New Industrial Permit, Section XVI.A.).

## V.     STATEMENT OF FACTS

### A. Watkins Facility

43.     Plaintiff is informed, believes and thereon alleges the Watkins Facility is approximately 21.85 acres and belongs to Sector Y of the Industrial Permit, standard industrial classifications (SIC) code 3999, Manufacturing Facilities not elsewhere classified.

44.     The EPA Industrial Stormwater Fact Sheet for Sector Y identifies solvents, acids and caustic, carbon black, plasticizers, paint, processing oils, resins, rubber, compounds and solutions, scrap plastic and rubber, fuels such as diesel or gasoline, adhesives, zinc, and miscellaneous chemicals as materials used at facilities within Sector Y. A copy of the Fact Sheet is attached hereto as Exhibit B and incorporated by reference.

45.     Plaintiff is informed, believes, and thereon alleges the Watkins Facility

primarily conducts portable spa manufacturing.

46.     Plaintiff is informed, believes, and thereon alleges the Watkins Facility also conducts vehicle and equipment cleaning and maintenance onsite.

47.     Plaintiff is informed, believes, and thereon alleges various industrial materials comprised of metals, cardboard, plastic, treated wood, resins, fiberglass, oil, electronics, old motors, and solvents are utilized and stored onsite.

48.     Plaintiff is informed, believes, and thereon alleges particulates from operations, oil, grease, suspended solids, hazardous waste, nitrates, nitrogen, various chemicals, resin and glue, phosphorus and metals such as iron, copper, and zinc materials are exposed to storm water at the Watkins Facility.

49.     Plaintiff is informed, believes, and thereon alleges that storm water is discharged from multiple discharge points at the Facility into the City of Vista's stormwater conveyance systems or directly to Agua Hedionda Creek and Agua Hedionda Lagoon.

50.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. (*See* 40 C.F.R. § 122.2). The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21).

51.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. (*See Rapanos v. United States,* 547 U.S. 715 (2006)).  A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." (*Id.* at 780).

52.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. (*Id.* at 783).

53.     Information available to Plaintiff indicates that each of the surface waters into which the Watkins Facility discharges polluted storm water are traditional navigable waters, or tributaries to such waters, such as Agua Hedionda Creek, Agua Hedionda Lagoon, and the Pacific Ocean.

54.     Plaintiff is informed, believes, and thereon alleges the Watkins Facility's polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in Agua Hedionda Creek and Agua Hedionda Lagoon. Elevated levels of bacteria, phosphorous, manganese, selenium, total dissolved solids, total nitrogen, and toxicity impair Agua Hedionda Creek's ability to support its beneficial uses.

55.     Water Quality Standards are pollutant concentration levels determined by the State Board and the EPA to be protective of the beneficial uses of the receiving waters.  Discharges above Water Quality Standards contribute to the impairment of the receiving waters' beneficial uses.

56.     The applicable Water Quality Standards include, but are not limited to, those set out by the State of California in the Criteria for Priority Toxic Pollutants, 40 C.F.R. § 131.38, ("California Toxics Rule" or "CTR") and in the San Diego Basin Plan. These numeric criteria are set to protect human health and the environment in the State of California. The CTR limits are the maximum concentration levels permissible to achieve health and environmental protection goals.

57.     EPA Benchmarks are the pollutant concentrations above which EPA has determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. (See Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (MSGP), 2015, §§6.2.1, 8.Y, Table 8.Y-1). The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention

measures are successfully implemented. (MSGP Fact Sheet, p. 52). Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. (*Id.*, at p. 65).

58.     EPA has established the following sector-specific benchmark values for Sector Y: zinc: 0.04-0.26 mg/L[1]. (MSGP, §8.Y, Table 8.Y-1).

59.     The Regional Board's Basin Plan establishes water quality objectives, implementation plans for point and nonpoint source discharges, and prohibitions, and furthers statewide plans and policies intended to preserve and enhance the beneficial uses of all waters in the San Diego region. (*See* Basin Plan at p. 1-1). The Basin Plan identifies several beneficial uses for regional waters, including for Agua Hedionda Creek and Agua Hedionda Lagoon. The Basin Plan establishes the following water quality objectives for the Carlsbad Hydrologic Unit, including Agua Hedionda Creek: iron: 0.3 mg/L; pH – not less than 6.5 and not greater than 8.5; phosphorus: .1 mg/L; nitrogen: 1.0 mg/L. (See Basin Plan at Table 3-2; p. 3-13; p. 3-25).

## B.     Past and Present Industrial Activity at the Watkins Facility

60.     Plaintiff is informed, believes, and thereon alleges that, in its Storm Water Pollution Prevention Plan ("SWPPP") and its Notice of Intent to Obtain Coverage under Industrial Permit submitted to the Regional Board, Defendant lists its primary SIC code as 3999 for facilities primarily engaged in production of miscellaneous plastic products.

61.     Plaintiff is informed, believes, and thereon alleges that Defendant engages in portable spa production.

62.     Plaintiff is informed, believes, and thereon alleges that Defendant engages in cutting, grinding, sanding and painting of wood, metal, fiberglass and resins, bulk material loading and unloading, and facility equipment maintenance.

63.     The potential pollutant sources associated with the industrial activities at the Watkins Facility include, but are not limited to: the scrap metal and recyclable

---

[1] The benchmark for zinc is dependent on water hardness.

Complaint for Declaratory and Injunctive Relief and Civil Penalties

materials outdoor storage areas; indoor and outdoor material storage areas; tooling areas; oil and lubricant storage; equipment and container storage areas; loading and unloading areas; maintenance areas; hazardous waste storage areas; spa manufacturing baghouse; and the on-site material handling equipment such as forklifts.

64.     Plaintiff is informed, believes, and thereon alleges that pollutants present in storm water discharged from the Watkins Facility therefore include but are not limited to: toxic metals such as iron, zinc, and copper; manganese; petroleum products including oil, fuel, grease, transmission fluids, brake fluids, hydraulic oil and diesel fuel; acids and solvents; lubricants; caustics; nitrogen; phosphorus; dissolved solids; total suspended solids and pH-affecting substances; hazardous waste; bacteria; and fugitive and other dust, dirt and debris.

65.     Based upon Plaintiff's investigation, Plaintiff is informed, believes, and thereon alleges Defendant stores metal products, scrap metal, and other materials outside where they are exposed to storm water.

66.      Plaintiff is informed, believes, and thereon alleges that there are containers stored on-site that are uncovered and/or uncontained.

67.     Plaintiff is informed, believes, and thereon alleges that at least one discharge point at the Watkins Facility conveys storm water pollution off the site and into area storm water conveyance systems.

68.     Plaintiff is informed, believes, and thereon alleges that the Watkins Facility lacks effective BMPs to control the flow of storm water from the Facility into storm water conveyance systems or directly into Agua Hedionda Creek and Agua Hedionda Lagoon.

69.     Suspended solids, metal particles, nutrients, and other pollutants have been and continue to be conveyed from the Watkins Facility into storm drain conveyance systems.

70.     Plaintiff is informed, believes, and thereon alleges that during rain events at the Watkins Facility, storm water carries pollutants from the outdoor storage areas,

bins and dumpsters; outdoor equipment and vehicles; maintenance areas; floor contaminants, equipment, and other sources directly into the storm drain conveyance systems or directly into Agua Hedionda Creek and Agua Hedionda Lagoon.

71.     Plaintiff is informed, believes, and thereon alleges that the Watkins Facility pollution control measures are ineffective in controlling the exposure of pollutant sources to storm water at the Watkins Facility.

### C.   The Watkins Facility and its Associated Discharge of Pollutants

72.     Plaintiff is informed, believes, and thereon alleges that with every significant rain event, the Watkins Facility discharges polluted storm water from the industrial activities at the facility via the City of Vista's storm drain system and into the Receiving Waters, or directly to Agua Hedionda Creek and Agua Hedionda Lagoon.

73.     Plaintiff is informed, believes, and thereon alleges that the Receiving Waters into which the Watkins Facility discharges polluted storm water are waters of the United States and therefore the Industrial Permit properly regulates discharges to those waters.

74.     Surface waters that cannot support their Beneficial Uses listed in the Basin Plan are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act. According to the 2012 and 2016 303(d) List of Impaired Water Bodies, Agua Hedionda Creek is impaired for bacteria, phosphorous, manganese, selenium, total dissolved solids, total nitrogen, and toxicity.

75.     Plaintiff is informed, believes, and thereon alleges that monitoring data indicates Agua Hedionda Creek does not meet applicable water quality standards.

76.     Because discharges from the Watkins Facility contain particulates, metals, and phosphorus the Watkins Facility's polluted discharges cause and/or contribute to the impairment of water quality in the Receiving Waters.

77.     Plaintiff is informed, believes, and thereon alleges that the storm water discharged from the Watkins Facility has exceeded the CTR Water Quality Standards applicable to zinc in California.

78.     Plaintiff is informed, believes, and thereon alleges that the storm water discharged from the Watkins Facility has exceeded the San Diego Basin Plan Water Quality Objectives for Iron and Phosphorus.

79.     Plaintiff is informed, believes, and thereon alleges that during every significant rain event that has occurred at the Watkins Facility since March 10, 2012, through the present, Defendant has discharged and continues to discharge storm water from the Watkins Facility that contains pollutants at levels in violation of the prohibitions and limitations set forth in the Industrial Permit and other applicable Water Quality Standards.

80.     Plaintiff is informed, believes, and thereon alleges, from visual observations, sample results, and information available to Plaintiff, the Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the Watkins Facility.

81.     The inadequacy of the BMPs at the Watkins Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and companion M&RP for this Site.

82.     Storm water discharges from the Watkins Facility contain pollutant concentration levels that are above both EPA Benchmarks and applicable Water Quality Standards.

83.     Plaintiff is informed, believes, and thereon alleges that since at least March 10, 2012 through the present, Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT at the Watkins Facility in violation of Effluent Limitation B(3) of the Industrial Permit and Effluent Limitation I.D. and V.A. of the New Industrial Permit.

84.     Each day that Defendant has failed and continues to fail to implement adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Industrial Permit and the CWA.

85.     Based on its investigation of the Watkins Facility, Plaintiff is informed and

believes that Defendant has failed to develop and implement an adequate SWPPP since at least March 10, 2012 through the present.

86.     Each day that Defendant has failed and continues to fail to implement an adequate SWPPP constitutes a separate violation of the Industrial Permit and the CWA.

87.     Plaintiff is informed, believes, and thereon alleges that Defendant has failed to submit written reports to the Regional Board identifying additional BMPs necessary to achieve BAT/BCT at the Watkins Facility since at least July 1, 2015, in violation of New Industrial Permit Receiving Water Limitations VI.A.-C and Special Condition XX.B.

88.     Each day that Defendant has operated the Watkins Facility without meeting this reporting requirement of the Industrial Permit constitutes a separate violation of the Industrial Permit and the CWA.

**D.     Defendant's Monitoring Program**

89.     From enrollment through June 30, 2015, the Watkins Facility was required to sample at least two storm events every rainy season in accordance with the sampling and analysis procedures set forth at Industrial Permit Section B(5).

90.     Until June 30, 2015, sampling and analysis procedures required that a sample be taken from all discharge locations at the Watkins Facility and that at least two samples be taken during the wet season: (1) one in the first storm event of a particular wet season; and (2) at least one other storm event in the wet season. (Industrial Permit, Sections B(5) and B(7)).

91.     From July 1, 2015 through the present, the Watkins Facility was required to sample at least two storm events within the first half of each reporting year (July 1 to December 31) and two storm events within the second half of each reporting year (January 1 to June 30) in accordance with the sampling and analysis procedures in New Industrial Permit Section XI.B.

92.     Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in

significant quantities in the storm water discharged from the facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

93.     Because of the presence of copper, zinc, selenium, iron, manganese, and phosphorus in Watkins's discharge, it is also required to sample for these constituents. (New Industrial Permit, §XI.B.6.c.).

94.     Though the EPA lists solvents and zinc as likely pollutants associated with Sector Y facilities, and metals and copper-treated wood are stored outdoors at the Watkins Facility, Watkins does not monitor its discharge for phosphorous, copper, selenium, manganese, iron or zinc.

95.     All monitoring data must be uploaded to SMARTS within 30 days of obtaining all results for each sampling event. (New Industrial Permit, XI.B.11.a)

96.     Plaintiff is informed, believes, and thereon alleges that despite the extremely high levels of pollutants reported in the samples that were taken at the Watkins Facility, the Defendant has not sampled and submitted sampling reports as required.

97.     Plaintiff is informed, believes, and thereon alleges that Defendant has not successfully sampled and reported during the 2016-2017, 2015-2016, 2014-2015, and 2013-2014 reporting years, as required by the Industrial Permit and New Industrial Permit.

98.     Information available to Plaintiff indicates that Defendant has not conducted any assessments or submitted any reports pursuant to Section XX.B of the New Industrial Permit.

**VI.    CLAIMS FOR RELIEF**

<u>**FIRST CAUSE OF ACTION**</u>
**Discharges of Contaminated Storm Water in**
**Violation of the Industrial Permit's Discharge Prohibitions and**
**Receiving Water Limitations and the Clean Water Act**
**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

99.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

100.    Plaintiff is informed, believes, and thereon alleges that as a result of the operations at the Watkins Facility, during every significant rain event, storm water containing pollutants harmful to fish, plant, bird life, and human health is discharged from the Watkins Facility to the Receiving Waters.

101.    Plaintiff is informed, believes, and thereon alleges that Defendant's discharges of contaminated storm water have caused, continue to cause, and threaten to cause pollution, contamination, and/or nuisance to the waters of the United States in violation of Sections III.C. and VI.C of the New Industrial Permit.

102.    Plaintiff is informed, believes, and thereon alleges that these discharges of contaminated storm water have, and continue to, adversely affect human health and the environment in violation of Section VI.B. of the New Industrial Permit.

103.    Plaintiff is informed, believes, and thereon alleges that these discharges of contaminated storm water have caused or contributed to and continue to cause or contribute to an exceedance of Water Quality Standards in violation of Discharge Prohibition III.D. and Receiving Water Limitation VI.A. of the New Industrial Permit and Discharge Prohibition A(2) of the Industrial Permit.

104.    Plaintiff is informed, believes, and thereon alleges that from at least March 10, 2012 through the present, Defendant has discharged, and continues to discharge, contaminated storm water from the Watkins Facility to Receiving Waters in violation of the prohibitions of the Industrial Permit and New Industrial Permit.

105.    Plaintiff is informed, believes, and thereon alleges that Defendant's violations of the Industrial Permit and New Industrial Permit and the CWA are ongoing.

106.    Defendant will continue to be in violation of the Industrial Permit and New Industrial Permit requirements each day the Watkins Facility discharges contaminated storm water in violation of the Permits' prohibitions.

107.    Every day that Defendant has discharged and/or continues to discharge polluted storm water from the Watkins Facility in violation of the Permits is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

108.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 10, 2012 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

109.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
**Failure to Develop and/or Implement BMPs that Achieve Compliance with Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology and Discharge in Violation of Effluent Limitations of the Industrial Permit**
**(Violations of 33 U.S.C. §§1311, 1342)**

110.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

111.     Plaintiff is informed, believes, and thereon alleges that Defendant has failed to develop and/or implement BMPs that achieve compliance with BAT/BCT requirements of the Industrial Permit, New Industrial Permit, and the CWA.

112.     Sampling of the Watkins Facility's storm water discharges as well as Plaintiff's observations and agency inspections of the Watkins Facility demonstrate that Defendant has not developed and has not implemented BMPs that meet the standards of BAT/BCT. Thus, Defendant is in violation of Effluent Limitations of the Industrial Permit and New Industrial Permit.

113.     Plaintiff is informed, believes, and thereon alleges that Defendant has been in daily and continuous violation of the BAT/BCT requirements of the Industrial Permit and the CWA every day since at least March 10, 2012, and the New Industrial Permit since at least July 1, 2015.

114.    The Industrial Permit and New Industrial Permit SWPPP requirements and effluent limitations require dischargers to reduce or prevent pollutants in their stormwater discharges through the implementation of measures that must achieve BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

115.    Defendant has discharged and continues to discharge stormwater from the Watkins Facility containing levels of pollutants that do not achieve compliance with the BAT/BCT requirements during every significant rain event occurring from March 10, 2012 through the present. Defendant's failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Industrial Permit and New Industrial Permit and the CWA. (Industrial Permit, Effluent Limitation B(3); New Industrial Permit §§ I(D) (Finding 32), V(A); 33 U.S.C. § 1311(b)).

116.    Plaintiff is informed, believes, and thereon alleges that Defendant's violations of the Effluent Limitations and the CWA are ongoing.

117.    Defendant will continue to be in violation every day the Watkins Facility operates without adequately developing and/or implementing BMPs that achieve BAT/BCT to prevent or reduce pollutants associated with industrial activity in storm water discharges at the Watkins Facility.

118.    Every day that Defendant operates the Watkins Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the Permits is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

119.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 10, 2012 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

120.    An action for injunctive relief under the CWA is authorized by 33 U.S.C.

§ 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Failure to Develop and/or Implement an Adequate
Storm Water Pollution Prevention Plan
in Violation of the Industrial Permit and Clean Water Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

121.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

122.     Plaintiff is informed, believes, and thereon alleges that Defendant has failed to develop and/or implement an adequate SWPPP for the Watkins Facility that meets the requirements set out in Section A and Provision E of the Industrial Permit and Section X of the New Industrial Permit.

123.     Defendant has been in violation of the SWPPP requirements every day since at least March 10, 2012.

124.     Defendant's violations of the Industrial Permit, New Industrial Permit and the CWA are ongoing.

125.     Defendant will continue to be in violation of the SWPPP requirements every day the Watkins Facility operates with an inadequately developed and/or implemented SWPPP for the Watkins Facility.

126.     Each day that Defendant operates the Watkins Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of the New Industrial Permit and Section 301(a) of the CWA, 33 U.S.C. §1311(a).

127.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 10, 2012 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for

Inflation, 40 C.F.R. §12.4.

128.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Failure to Implement an**
**Adequate Monitoring and Reporting Program**
**In Violation of the Industrial Permit and the Clean Water Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

129.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

130.     Plaintiff is informed, believes, and thereon alleges that Defendant has failed to develop and/or implement an adequate M&RP for the Watkins Facility as required by Section B and Provision E(3) of the Industrial Permit and Section X.I of the New Industrial Permit.

131.     Plaintiff is informed, believes, and thereon alleges that conditions at the Watkins Facility, as determined via sampling of storm water discharges from the Watkins Facility, and the annual reports submitted by Defendant all demonstrate that the Watkins Facility has not implemented an adequate M&RP that meets the requirements of the Industrial Permit and New Industrial Permit.

132.     Plaintiff is informed, believes, and thereon alleges that Defendant has failed and continues to fail to collect samples from all discharge points during all storm events in violation of Section B(5) of the Industrial Permit.

133.     Plaintiff is informed, believes, and thereon alleges that Defendant's M&RP fails to include sampling of all required constituents during all storm events in violation of Sections X.I. and XI.B of the New Industrial Permit.

134.     Plaintiff is informed, believes, and thereon alleges that Defendant has failed and continues to fail to identify inadequacies in its M&RP.

135.     Defendant's violations of the New Industrial Permit and the CWA are ongoing.

136.     Defendant will continue to be in violation of the Industrial Permit and New Industrial Permit and the CWA each day the Watkins Facility operates with an inadequately implemented M&RP.

137.     Each day Defendant operates the Watkins Facility without implementing an adequate M&RP for the Watkins Facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

138.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from March 10, 2012 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

139.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
### Failure to Conduct Required Rain Event Sampling in Violation of the Industrial Permit

140.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

141.     Plaintiff is informed, believes, and thereon alleges that Defendant is in violation of Industrial Permit, Section B(5)(c) and New Industrial Permit §XI.B.6 by failing to sample for all required constituents, including but not limited to Phosphorus, Copper, Zinc, Manganese, Selenium and Iron.

142.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring

from March 10, 2012 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

143.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. §1365(a). Continuing commission of the omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

## VII.    RELIEF REQUESTED

144.    Wherefore, Plaintiff respectfully request that this Court grant the following relief:

a.    An order declaring Defendant to have violated and to be in violation of Section 301(a) of the CWA 33 U.S.C. § 1311(a) for its unlawful discharges of pollutants from the Watkins Facility in violation of the substantive and procedural requirements of the New Industrial Permit;

b.    An order enjoining the Defendant from violating the substantive and procedural requirements of the New Industrial Permit;

c.    An order assessing civil monetary penalties of $37,500 per day per violation for each violation of the CWA at the Watkins Facility occurring through November 1, 2015, and $51,570 per violation occurring on or after November 2, 2015, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

d.    An order requiring Defendant to take appropriate actions to restore the quality of waters impaired by its activities;

e.    An order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

f.      Any other relief as this Court may deem appropriate.

Dated: March 16, 2018

Respectfully submitted,

COAST LAW GROUP LLP


By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorneys for Plaintiff
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlaw.com

# EXHIBIT A

60 Day Notice Letter



1140 S. Coast Highway 101
Encinitas, CA 92024

Tel  760-942-8505
Fax  760-942-8515
www.coastlawgroup.com

**March 10, 2017**

Jerome Stout                                    **VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED**
Watkins Manufacturing Corporation
1280 Park Center Dr
Vista California 92081

C T Corporation System
818 W. 7th Street Ste 930
Los Angeles CA 90017

**Re:    Clean Water Act Notice of Intent to Sue/60-Day Notice Letter
            Watkins Manufacturing Corporation Violations of General Industrial Permit**

Dear Mr. Stout:

Please accept this letter on behalf of the Coastal Environmental Rights Foundation (CERF) regarding Watkins Manufacturing Corporation ("Watkins")'s violations of the State Water Resources Control Board Water Quality Order Nos. 97-03-DWQ and 2014-0057-DWQ, Natural Pollutant Discharge Elimination System (NPDES), General Permit No. CAS000001, and Waste Discharge Requirements for Discharges of Storm Water Associated With Industrial Activities Excluding Construction Activities (Industrial Permit).[1] This letter constitutes CERF's notice of intent to sue for violations of the Clean Water Act and Industrial Permit for Watkins' facility located at 1280 Park Center Drive, Vista, California, 92081 ("Facility"), as set forth in more detail below.

Section 505(b) of the Clean Water Act requires that sixty (60) days prior to the initiation of a citizen's civil lawsuit in Federal District Court under Section 505(a) of the Act, a citizen must give notice of the violations and the intent to sue to the violator, the Administrator of the U.S. Environmental Protection Agency, the Regional Administrator of the U.S. Environmental Protection Agency for the region in which the violations have occurred, the U.S. Attorney General, and the Chief Administrative Officer for the State in which the violations have occurred (33 U.S.C. § 1365(b)(1)(A)). This letter provides notice of Watkins' Clean Water Act violations and CERF's intent to sue.

**I.      Coastal Environmental Rights Foundation (CERF)**

CERF is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Encinitas, CA. CERF is dedicated to the preservation, protection, and defense of the environment, the wildlife, and the natural resources of the

---

[1] The Industrial Permit amendments, pursuant to Order No. 2014-0057-DWQ, become effective July 1, 2015. All references are to the Industrial Permit prior to modification pursuant to Order No. 2014-0057-DWQ are to the "Industrial Permit." All references to the Permit as modified by Order No. 2014-0057-DWQ are to the "New Industrial Permit."

California Coast. Members of CERF use and enjoy the waters into which pollutants from Watkins' ongoing illegal activities are discharged, namely Agua Hedionda Creek, Agua Hedionda Lagoon, and ultimately the Pacific Ocean.

The public and members of CERF use Agua Hedionda Creek, Agua Hedionda Lagoon and the Pacific Ocean to fish, sail, boat, kayak, surf, swim, scuba dive, birdwatch, view wildlife, and to engage in scientific studies. The discharge of pollutants by the Watkins Facility affects and impairs each of these uses. Thus, the interests of CERF's members have been, are being, and will continue to be adversely affected by Watkins Owners and/or Operators' failure to comply with the Clean Water Act and the Industrial Permit.

## II. Storm Water Pollution and the Industrial Permit

### A. Duty to Comply

Under the Clean Water Act, the discharge of any pollutant to a water of the United States is unlawful except in compliance with certain provisions of the Clean Water Act. (See 33 U.S.C. § 1311 (a)). In California, any person who discharges storm water associated with industrial activity must comply with the terms of the Industrial Permit in order to lawfully discharge. Watkins enrolled as a discharger subject to the New Industrial Permit on January 30, 2015 with WDID No. 9 37I005398. Watkins originally enrolled under the Industrial Permit on September 1, 2005.

Pursuant to the Industrial Permit, a facility operator must comply with all conditions of the Industrial Permit. Failure to comply with the Industrial Permit is a Clean Water Act violation. (Industrial Permit, § C.1; New Industrial Permit §XXI.A. ["Permit noncompliance constitutes a violation of the Clean Water Act and the Water Code..."]). Any non-compliance further exposes an owner/operator to an (a) enforcement action; (b) Industrial Permit termination, revocation and re-issuance, or modification; or (c) denial of a Industrial Permit renewal application. (*Id.*).  As an enrollee, Watkins has a duty to comply with the Industrial Permit and is subject to all of the provisions therein.

### B. Inadequate Storm Water Pollution Prevention Plan

One of the main requirements of the Industrial Permit (and New Industrial Permit) is the Storm Water Pollution Prevention Plan (SWPPP). (Industrial Permit §A; New Industrial Permit, Finding I.54, §X).  Watkins has not developed an adequate SWPPP as required by the New Industrial Permit.

The SWPPP's site plan fails to include all elements as required by New Industrial Permit Section X.E. The SWPPP fails to identify nearby water bodies, municipal storm drain inlets, locations where materials are directly exposed to precipitation, and areas of industrial activity, including outdoor storage areas, shipping and receiving areas, waste treatment and disposal areas, material reuse areas, and vehicle and equipment storage/maintenance areas. (New Industrial Permit, §X.E.3.).

The Watkins SWPPP dated June 2015 also fails to adequately assess the Facility's potential contribution of 303(d) listed pollutants to receiving waters. Per section X.G.2.a.ix of the New Industrial Permit, the Watkins Owners and/or Operators are required to assess the

potential industrial pollutant sources to receiving waters with 303(d) listed impairments identified in Appendix 3. (New Industrial Permit, §X.G.2.a.ix). The SWPPP identifies only elevated coliform bacteria as a 303d listing for the receiving water, and Nitrogen and Phosphorus as TMDL constituents.[2] (SWPPP, p. 4). However, Agua Hedionda Creek is listed as impaired for enterococcus, fecal coliform, manganese, selenium, total dissolved solids, and toxicity as well.

The SWPPP fails not only to assess the potential presence of all 303(d)-listed constituents, but also additional pollutants. (SWPPP, p. 9). This is completely inadequate, especially because the EPA Fact Sheet for Sector Y specifically identifies numerous additional pollutants associated with Sector Y, including solvents and zinc.[3]  The SWPPP further acknowledges the use and presence of metals, resins, fiberglass and treated wood stock at the Facility, as well as outdoor storage of scrap metal, electronics and old motors. (SWPPP, pp. 6-7). However, the SWPPP fails to include these constituents as part of the Facility's monitoring protocol, in violation of the New Industrial Permit. (New Industrial Permit, §XI.B.6.c.; see SWPPP, p. 35, Section 9.4.3).

Lastly, the City of Vista February 2016 stormwater compliance inspection report identified non-compliant BMPs requiring correction, including the following note: "stored metal material and tub molds are a significant source of metals, and pose a threat of metal pollution discharge. All stored metal material (metal shelving, stored tubs) and tub molds must be removed from outside or covered appropriately." (Inspection Number 14290). Thus, the Watkins Facility is not only a potential source of additional pollutants, it likely contributes to the impairment of receiving waters by failing to adequately implement BMPs to reduce the presence of such pollutants in its discharge. Watkins' failure to include metals, including zinc, copper, selenium, and manganese, and phosphorus, total dissolved solids and nitrogen in its SWPPP as potential pollutants for evaluation and water monitoring constitutes a violation of the New Industrial Permit and Clean Water Act. (New Industrial Permit, §X.G. 2; §XI.B.6.c.).

Every day the Watkins Owners and/or Operators operate the Facility without an adequate SWPPP constitutes a separate and distinct violation of the Industrial Permit, the New Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Watkins Owners and/or Operators have been in daily and continuous violation of the Industrial Permit since at least March 10, 2012. These violations are ongoing and the Watkins Owners  and/or Operators will continue to be in violation every day they fail to address the SWPPP inadequacies. Thus, the Watkins Owners and/or Operators are liable for civil penalties of up to $37,500 per day for violations prior to November 2, 2015, and $51,570 per day of violations occurring after November 2, 2015. (33 U.S.C. §1319(d); 40 CFR 19.4; New Industrial Permit, §XXI.Q.1).

## C.    Failure to Monitor

The Watkins Owners and/or Operators have failed to sample as required during the 2015-2016, 2014-2015, and 2013-2014 wet seasons, though numerous qualifying events

---

[2] The SWPPP fails to identify the water body to which the Facility purportedly discharges to and the receiving water for which such TMDL is established. Agua Hedionda Creek does not have an established TMDL for these constituents. (See http://www.waterboards.ca.gov/rwqcb9/water_issues/programs/tmdls/lagoons_aguahediondacreek.shtml and http://www.waterboards.ca.gov/rwqcb9/water_issues/programs/tmdls/tmdladopted.shtml)

[3] https://www.epa.gov/sites/production/files/2015-10/documents/sector_y_rubberplastic.pdf

**Notice of Intent to Sue: Clean Water Act**
*Watkins Manufacturing*
**March 10, 2017**
**Page 4**

occurred.

Sections B(5) and (7) of the Industrial Permit required dischargers to visually observe and collect samples of storm water discharged from all locations where storm water is discharged. Facility operators, including the Watkins Owners and/or Operators, were required to collect samples from at least two qualifying storm events each wet season, including one set of samples during the first storm event of the wet season. Required samples were to be collected by Facility operators from all discharge points and during the first hour of the storm water discharge from the Facility. Watkins failed to monitor as required during the 2013-2014 and 2014-2015 wet seasons. Watkins also failed to sample at discharge point 1 for virtually all monitoring events.

The New Industrial Permit requires dischargers to take two samples between July 1 and December 31 and two samples between January 1 and June 30. (New Industrial Permit, §XI.B.2). Nonetheless, Watkins has failed to comply with these requirements. (See 2015-2016 Annual Report, Question 3). Watkins has also failed to sample the requisite number of qualified storm events for the first half of the 2016-2017 year.

Lastly, Watkins' failure to sample for magnesium, nitrate, nitrite and total nitrogen, phosphorous, selenium, magnesium, copper, zinc, and total dissolve solids – constituents that are likely present at the Facility and for which receiving waters are listed – constitutes an additional violation of the New Industrial Permit. (New Industrial Permit, §XI.B.6.c.).

Every day the Watkins Owners and/or Operators failed to adequately monitor the Facility is a separate and distinct violation of the Industrial Permit, New Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These violations are ongoing and the Watkins Owners and/or Operators will continue to be in violation every day they fail to adequately monitor the Facility. The Watkins Owners and/or Operators are thus subject to penalties in accordance with the Industrial Permit – punishable by a minimum of $37,500 per day of violations prior to November 2, 2015, and $51,570 per day of violations occurring after November 2, 2015. (33 U.S.C. §1319(d); 40 CFR 19.4; New Industrial Permit, §XXI.Q.1).

### D.      Unauthorized Non-Storm Water Discharges

Except as authorized by Section IV of the New Industrial Permit, permittees are prohibited from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. (New Industrial Permit, §III.B.; IV.A-B).

Information available to CERF indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges. For example, unauthorized non-storm water discharges occur from the Facility's compressed air dryer condensate, air conditioners, and sprinkler system testing. The Watkins Owners and/or Operators conduct these activities without BMPs to prevent related non-storm water discharges. Non-storm water discharges from condensate and sprinkler testing without adequate BMPs – including prevention of contact with industrial areas and monthly visual observations – do not constitute authorized non-storm water discharges pursuant to Section IV.A. of the New Industrial Permit.

Notice of Intent to Sue: Clean Water Act
*Watkins Manufacturing*
March 10, 2017
Page 5

Further, the San Diego Regional Municipal Separate Storm Sewer System (MS4) Permit Section E.2.a. prohibits the discharge of unauthorized non-storm water as an illicit discharge. Specifically, air conditioning condensation should be directed to landscaped or other pervious surfaces or the sanitary sewer – not the storm drains. (MS4 Permit, Section E.2.a.(4)(a)). Notably, air dryer condensate is not an authorized non-storm water discharge pursuant to the MS4 Permit.

Watkins' unauthorized non-storm water discharge violations are ongoing and will continue until the Watkins Owners and/or Operators develop and implement BMPs that prevent prohibited non-storm water discharges or obtain separate NPDES permit coverage. Each time the Watkins Owners and/or Operators discharge prohibited non-storm water in violation of Discharge Prohibition III.B. of the Permit is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). CERF will update the number and dates of violations when additional information becomes available. The Watkins Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since March 10, 2012.

### III.    Remedies

Upon expiration of the 60-day period, CERF will file a citizen suit under Section 505(a) of the Clean Water Act for the above-referenced violations. During the 60-day notice period, however, CERF is willing to discuss effective remedies for the violation noted in this letter. If you wish to pursue such discussions in the absence of litigation, it is suggested that you initiate those discussions immediately. If good faith negotiations are not being made, at the close of the 60-day notice period, CERF will move forward expeditiously with litigation.

Watkins must develop and implement a SWPPP which complies with all elements required in the New Industrial Permit, including the requisite monitoring, and address the consistent, numerous, and ongoing violations at the Facility. Should the Watkins Owners and/or Operators fail to do so, CERF will file an action against Watkins for its prior, current, and anticipated violations of the Clean Water Act.

CERF's action will seek all remedies available under the Clean Water Act §1365(a)(d). CERF will seek the maximum penalty available under the law which is $37,500 per day of violations prior to November 2, 2015, and $51,570 per day of violations occurring after November 2, 2015. (33 U.S.C. §1319(d); 40 CFR 19.4; New Industrial Permit, §XXI.Q.1). CERF may further seek a court order to prevent Watkins from discharging pollutants. Lastly, section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing parties to recover costs, including attorneys' and experts' fees. CERF will seek to recover all of its costs and fees pursuant to section 505(d).

### IV.    Conclusion

CERF has retained legal counsel to represent it in this matter. Please direct all communications to Coast Law Group:

**Notice of Intent to Sue: Clean Water Act**
*Watkins Manufacturing*
**March 10, 2017**
**Page 6**

---

> **Marco A. Gonzalez**
> **Livia B. Beaudin**
> **COAST LAW GROUP LLP**
> **1140 S. Coast Highway 101**
> **Encinitas, CA 92024**
> **Tel: (760) 942-8505 x 102**
> **Fax: (760) 942-8515**
> **Email: marco@coastlawgroup.com**
> **livia@coastlawgroup.com**

CERF will entertain settlement discussions during the 60-day notice period. Should you wish to pursue settlement, please contact Coast Law Group LLP at your earliest convenience.

Sincerely,

**COAST LAW GROUP LLP**

**Marco A. Gonzalez**

**Livia Borak Beaudin**
Attorneys for
Coastal Environmental Rights Foundation

cc:

| | |
|---|---|
| Alexis Strauss<br>Acting Regional Administrator<br>U.S. EPA, Region 9<br>75 Hawthorne Street<br>San Francisco, CA, 94105 | Dave Gibson, Executive Officer<br>Catherine Hagan, Staff Counsel<br>San Diego Regional Water Quality Control Board<br>2375 Northside Drive, Suite 100<br>San Diego, CA 92108-2700 |
| Scott Pruitt<br>EPA Administrator<br>William Jefferson Clinton Building<br>1200 Pennsylvania Avenue N.W.<br>Washington, DC 20004 | Thomas Howard<br>Executive Director<br>State Water Resources Control Board<br>P.O. Box 100<br>Sacramento, CA 95812–0110 |

# EXHIBIT B

EPA Industrial Stormwater Fact Sheet for Sector Y

# INDUSTRIAL STORMWATER

## FACT SHEET SERIES

*Sector Y: Rubber, Miscellaneous Plastic Products, and Miscellaneous Manufacturing Industries*



U.S. EPA Office of Water
EPA-833-F-06-040
December 2006

## What is the NPDES stormwater permitting program for industrial activity?

Activities, such as material handling and storage, equipment maintenance and cleaning, industrial processing or other operations that occur at industrial facilities are often exposed to stormwater. The runoff from these areas may discharge pollutants directly into nearby waterbodies or indirectly via storm sewer systems, thereby degrading water quality.

In 1990, the U.S. Environmental Protection Agency (EPA) developed permitting regulations under the National Pollutant Discharge Elimination System (NPDES) to control stormwater discharges associated with eleven categories of industrial activity. As a result, NPDES permitting authorities, which may be either EPA or a state environmental agency, issue stormwater permits to control runoff from these industrial facilities.

## What types of industrial facilities are required to obtain permit coverage?

This fact sheet specifically discusses stormwater discharges from rubber, miscellaneous plastic products, and manufacturing facilities as described by Standard Industrial Classification (SIC) Major Group 30. Facilities and products in this group fall under the following categories, all of which require coverage under an industrial stormwater permit:

- ◆ Tires and inner tubes (SIC 3011)
- ◆ Rubber and plastic footwear (SIC 3021)
- ◆ Rubber and plastic hose and belting (SIC 3052)
- ◆ Gaskets, packaging, and sealing devices (SIC 3053)
- ◆ Fabricated rubber products, not elsewhere classified (SIC 3061 and 3069)
- ◆ Miscellaneous plastic products (SIC 3081 and 3089)
- ◆ Miscellaneous manufacturing industries (SIC 3991-3999)

Also discussed are stormwater discharges from miscellaneous manufacturing industries (except jewelry, silverware, and plateware) commonly identified by SIC Major Group 39 (except for 391). Miscellaneous manufacturing industries specifically include manufacturers of:

- ◆ Musical instruments (SIC 3931)
- ◆ Games, toys, and athletic goods (SIC 3942-3949)
- ◆ Pens, pencils, and artists' supplies (SIC 3951-3955, except 3952)
- ◆ Buttons, pins, and needles (SIC 3961 and 3965)

**1**

## What does an industrial stormwater permit require?

Common requirements for coverage under an industrial stormwater permit include development of a written stormwater pollution prevention plan (SWPPP), implementation of control measures, and submittal of a request for permit coverage, usually referred to as the Notice of Intent or NOI. The SWPPP is a written assessment of potential sources of pollutants in stormwater runoff and control measures that will be implemented at your facility to minimize the discharge of these pollutants in runoff from the site. These control measures include site-specific best management practices (BMPs), maintenance plans, inspections, employee training, and reporting. The procedures detailed in the SWPPP must be implemented by the facility and updated as necessary, with a copy of the SWPPP kept on-site. The industrial stormwater permit also requires collection of visual, analytical, and/or compliance monitoring data to determine the effectiveness of implemented BMPs. For more information on EPA's industrial stormwater permit and links to State stormwater permits, go to **www.epa.gov/npdes/stormwater** and click on "Industrial Activity."

## What pollutants are associated with activities at my facility?

Pollutants conveyed in stormwater discharges from facilities involved with the manufacturing of rubber, miscellaneous plastic, and other products will vary. There are a number of factors that influence to what extent industrial activities and significant materials can affect water quality.

- Geographic location
- Topography
- Hydrogeology
- Extent of impervious surfaces (e.g.,, concrete or asphalt)
- Type of ground cover (e.g., vegetation, crushed stone, or dirt)
- Outdoor activities (e.g., material storage, loading/unloading, vehicle maintenance)
- Size of the operation
- Type, duration, and intensity of precipitation events

Most of the actual manufacturing and processing activities associated with this industry normally occur indoors. However, there is a wide variety of materials used at these facilities which may include:

- Solvents
- Acids and caustic
- Carbon black
- Plasticizers
- Paint
- Processing oils
- Resins
- Rubber compounds and solutions
- Scrap plastic and rubber
- Fuels such as diesel or gasoline
- Adhesives
- Zinc
- Miscellaneous chemicals

Tanks, drums, or bags of these materials (including raw materials, by-products, final products, or waste products) may be exposed to stormwater during loading/unloading operations or through outdoor storage or handling at some facilities. Other items which may be exposed to stormwater include surplus processing machinery, scrap metal, PVC pipe, and rags.

The activities, pollutant sources, and pollutants detailed in Table 1 are commonly found at Rubber, miscellaneous plastic product, and miscellaneous manufacturing facilities.

EXHIBIT B Page 2 of 9

*Table 1.  Common Activities, Pollutant Sources, and Associated Pollutants at Rubber, Miscellaneous Plastic Products, and Miscellaneous Manufacturing Facilities*

| Activity | Pollutant Source | Pollutant |
|---|---|---|
| Outdoor material loading/unloading | Wooden pallets, spills/leaks from material handling equipment, solvents, resins | Total suspended solids (TSS), oil and grease, organics |
| Outdoor material and equipment storage | Solvents, acids and caustic, plasticizers, paint, lubricating oils, processing oils, resins, rubber compounds, mineral spirits, zinc, scrap metal, scrap plastic and rubber, plastic pellets, PVC pipe, and rags | Organics, zinc, hydrocarbons, oil and grease, acids, alkalinity |

## What BMPs can be used to minimize contact between stormwater and potential pollutants at my facility?

A variety of BMP options may be applicable to eliminate or minimize the presence of pollutants in stormwater discharges from rubber, miscellaneous plastic products, and miscellaneous manufacturing facilities. You will likely need to implement a combination or suite of BMPs to address stormwater runoff at your facility. Your first consideration should be for pollution prevention BMPs, which are designed to prevent or minimize pollutants from entering stormwater runoff and/or reduce the volume of stormwater requiring management. Prevention BMPs can include regular cleanup, collection and containment of debris in storage areas, and other housekeeping practices, spill control, and employee training. It may also be necessary to implement treatment BMPs, which are engineered structures intended to treat stormwater runoff and/or mitigate the effects of increased stormwater runoff peak rate, volume, and velocity. Treatment BMPs are generally more expensive to install and maintain and include oil-water separators, wet ponds, and proprietary filter devices.

BMPs must be selected and implemented to address the following:

### Good Housekeeping Practices

Good housekeeping is a practical, cost-effective way to maintain a clean and orderly facility to prevent potential pollution sources from coming into contact with stormwater. It includes establishing protocols to reduce the possibility of mishandling materials or equipment and training employees in good housekeeping techniques. Common areas where good housekeeping practices should be followed include trash containers and adjacent areas, material storage areas, vehicle and equipment maintenance areas, and loading docks. Good housekeeping practices must include a schedule for regular pickup and disposal of garbage and waste materials and routine inspections of drums, tanks, and containers for leaks and structural conditions. Practices also include containing and covering garbage, waste materials, and debris. Involving employees in routine monitoring of housekeeping practices has proven to be an effective means of ensuring the continued implementation of these measures.

### Minimizing Exposure

Where feasible, minimizing exposure of potential pollutant sources to precipitation is an important control option. Minimizing exposure prevents pollutants, including debris, from coming into contact with precipitation and can reduce the need for BMPs to treat contaminated stormwater runoff. It can also prevent debris from being picked up by stormwater and carried into drains and surface waters. Examples of BMPs for exposure minimization include covering materials or activities with temporary structures (e.g., tarps) when wet weather is expected or moving materials or activities to existing or new permanent structures (e.g., buildings, silos, sheds). Even the simple practice of keeping a dumpster lid closed can be a very effective pollution prevention measure.

### Erosion and Sediment Control

BMPs must be selected and implemented to limit erosion on areas of your site that, due to topography, activities, soils, cover, materials, or other factors are likely to experience erosion. Erosion

control BMPs such as seeding, mulching, and sodding prevent soil from becoming dislodged and should be considered first. Sediment control BMPs such as silt fences, sediment ponds, and stabilized entrances trap sediment after it has eroded. Sediment control BMPs should be used to back-up erosion control BMPs.

## Management of Runoff

Your SWPPP must contain a narrative evaluation of the appropriateness of stormwater management practices that divert, infiltrate, reuse, or otherwise manage stormwater runoff so as to reduce the discharge of pollutants. Appropriate measures are highly site-specific, but may include, among others, vegetative swales, collection and reuse of stormwater, inlet controls, snow management, infiltration devices, and wet retention measures.

Additionally, identifying weaknesses in current facility practices will aid the permittee in determining appropriate BMPs that will achieve a reduction in pollutant loadings.

A combination of preventive and treatment BMPs will yield the most effective stormwater management for minimizing the offsite discharge of pollutants via stormwater runoff. Though not specifically outlined in this fact sheet, BMPs must also address preventive maintenance records or logbooks, regular facility inspections, spill prevention and response, and employee training.

All BMPs require regular maintenance to function as intended. Some management measures have simple maintenance requirements, others are quite involved. You must regularly inspect all BMPs to ensure they are operating properly, including during runoff events. As soon as a problem is found, action to resolve it should be initiated immediately.

Implement BMPs, such as those listed below in Table 2 for the control of pollutants at rubber, miscellaneous plastic products and miscellaneous manufacturing facilities, to minimize and prevent the discharge of pollutants in stormwater. Identifying weaknesses in current facility practices will aid the permittee in determining appropriate BMPs that will achieve a reduction in pollutant loadings. BMPs listed in Table 2 are broadly applicable to rubber, miscellaneous plastic products and miscellaneous manufacturing facilities; however, this is not a complete list and you are recommended to consult with regulatory agencies or a stormwater engineer/consultant to identify appropriate BMPs for your facility.

*Table 2.  BMPs for Potential Pollutant Sources at Rubber, Miscellaneous Plastic Products, and Miscellaneous Manufacturing Facilities*

| Pollutant Sources | BMPs |
| --- | --- |
| Outdoor material unloading/loading | ❑ Confine loading/unloading activities to designated areas outside drainage pathways and away from surface waters. |
| | ❑ Close storm drains during loading/unloading activities in surrounding areas. |
| | ❑ Use a dead-end sump where materials could be directed. |
| | ❑ Inspect containers for leaks or damage prior to loading/unloading. |
| | ❑ Avoid loading/unloading materials in the rain or provide cover or other protection for loading docks. |
| | ❑ Provide diversion berms, dikes or grassed swales around the perimeter of the area to limit run-on. |
| | ❑ Cover loading and unloading areas and perform these activities on an impervious pad to enable easy collection of spilled materials. |
| | ❑ Slope the impervious concrete floor or pad to collect spills and leaks and convey them to proper containment and treatment. |
| | ❑ Provide overhangs or door skirts to enclose trailer ends at truck loading/unloading docks. |

*Table 2.  BMPs for Potential Pollutant Sources at Rubber, Miscellaneous Plastic Products, and Miscellaneous Manufacturing Facilities (continued)*

| Pollutant Sources | BMPs |
|---|---|
| Outdoor material unloading/loading (continued) | ❑ For rail transfer, a drip pan shall be installed within the rails to collect spillage from the tank. |
| | ❑ Where liquid or powdered materials are transferred in bulk to/from truck or rail cars, ensure hose connection points at storage containers are inside containment areas, or drip pans are used in areas where spillage may occur which are not in a containment area. |
| | ❑ Place catch trays between the dock and trailer at shipping and receiving bays to capture solids. |
| | ❑ Enclose material handling systems. |
| | ❑ Cover materials entering and leaving areas. |
| | ❑ Use dry cleanup methods instead of washing the areas down. |
| | ❑ Regularly sweep area to minimize debris on the ground and dispose of materials properly. |
| | ❑ Provide dust control if necessary. When controlling dust, sweep and/or apply water or materials that will not impact surface or ground water. |
| | ❑ Develop and implement spill prevention, containment, and countermeasure (SPCC) plans. |
| | ❑ Train employees in spill prevention, control, cleanup, and proper materials management techniques. |
| | ❑ Inspect pallets for protruding nails or broken boards. |
| Outdoor material storage | ❑ Cover storage areas with roofs or tarps. |
| | ❑ Confine storage of raw materials, parts, and equipment to designated areas away from high traffic, outside drainage pathways and away from surface waters. |
| | ❑ Provide secondary containment around chemical storage areas. |
| | ❑ If containment structures have drains, ensure that the drains have valves, and that valves are maintained in the closed position. Institute protocols for checking/testing stormwater in containment areas prior to discharge. |
| | ❑ Provide diversion berms, dikes or grassed swales around the perimeter of the area to limit run-on. |
| | ❑ Direct stormwater runoff to an on-site retention pond. |
| | ❑ Ensure that all containers are properly sealed and valves closed. |
| | ❑ Conduct container integrity testing and provide leak detection. |
| | ❑ Inspect storage tanks and piping systems (pipes, pumps, flanges, couplings, hoses, and valves) for failures or leaks and perform preventive maintenance. |
| | ❑ Plainly label all containers. |
| | ❑ Maintain an inventory of fluids to identify leakage. |
| | ❑ Wash and rinse containers indoors before storing them outdoors. |
| | ❑ Train employees on proper spill prevention and response techniques. |
| | ❑ Train employees on proper waste control and disposal. |
| Waste management | ❑ Store waste in enclosed and/or covered areas. |
| | ❑ Store wastes in covered, leak proof containers (e.g., dumpsters, drums). |
| | ❑ Cover the dumpsters or move them indoors. |
| | ❑ Use linked dumpsters that do not leak. |
| | ❑ Provide a lining for the dumpsters. |

EXHIBIT B Page 5 of 9

**Table 2.  BMPs for Potential Pollutant Sources at Rubber, Miscellaneous Plastic Products, and Miscellaneous Manufacturing Facilities (continued)**

| Pollutant Sources | BMPs |
|---|---|
| Waste management (continued) | ❑ Dispose or recycle packaging properly. |
| | ❑ Ensure hazardous and solid waste disposal practices are performed in accordance with applicable federal, state, and local requirements. |
| | ❑ Ship all wastes to offsite licensed landfills or treatment facilities. |
| Particulate emission management | ❑ Clean around vents and stacks. |
| | ❑ Place tubs around vents and stacks to collect particulates. |
| | ❑ Inspect air emission control systems regularly and repair or replace when necessary. |
| *Rubber Manufacturers - Zinc material management* | |
| Material storage | ❑ Store zinc bags indoors. |
| | ❑ Use of special large volume sacks (2,500 pound sacks rather than 50- to 100-pound sacs) with less potential for releases of zinc. |
| | ❑ Store materials in use in sealable container. |
| | ❑ Provide an airspace between the container and the cover to minimize "puffing" losses when the container is opened. |
| | ❑ Use automatic dispensing and weighing equipment. |
| | ❑ Use pre-weighed bags that can be thrown directly into the mixer to reduce spillage. |
| | ❑ Clean up spills without washing zinc into storm drains. |
| | ❑ Train employees on proper handling and emptying of zinc bags. |
| Dumpsters | ❑ Cover the dumpsters or move them indoors. |
| | ❑ Use linked dumpsters that do not leak. |
| | ❑ Provide a lining for the dumpsters. |
| Dust collectors or baghouses | ❑ Repair or replace improperly operating baghouses. |
| | ❑ Provide regular maintenance. |
| Grinding operations from which zinc dust may be released | ❑ Use dust collection system or reduce the amount of dust generated. |
| Zinc stearate coating operations | ❑ Develop a spill prevention/response plan. |
| | ❑ Use dry cleanup methods for spills. |
| | ❑ Use alternate compounds to zinc stearate. |
| *Plastics Manufacturers - Plastic Pellet Management* | |
| Management | ❑ Conduct regularly scheduled self evaluations to identify problem areas. |
| | ❑ Encourage information sharing between companies. |
| | ❑ Develop educational materials for employees, including those involved in transporting pellets. |
| Education and training | ❑ Educate key officials and company managers regarding the fate and effects and the economic disadvantages of pellet loss. |
| | ❑ Educate company employees regarding environmental hazards of pellet loss and employee responsibility for corrective actions. |
| | ❑ Train pellet handlers to operate equipment, particularly fork lifts, in a manner that minimizes the potential for pellet loss. |

EXHIBIT B Page 6 of 9

**Table 2. BMPs for Potential Pollutant Sources at Rubber, Miscellaneous Plastic Products, and Miscellaneous Manufacturing Facilities (continued)**

| Pollutant Sources | BMPs |
|---|---|
| Equipment and facilities | ❑ Install a containment system to capture stormwater runoff. |
| | ❑ Implement dry cleanup procedures. |
| | ❑ Install connecting hoses equipped with valves that will close automatically when the connection is broken. |
| | ❑ Direct the water flow from rail hopper cars and bulk trucks through a screen to capture the pellets rather than spilling them onto the ground. |
| | ❑ Seal expansion joints in concrete floors with a flexible material to facilitate cleanup. |
| | ❑ Install alarms in the pellet conveying system. |
| | ❑ Pave all pellet handling areas, including loading docks and rail sidings. |
| | ❑ Place screening in storm drains. |
| | ❑ Place control devices where they can be serviced without losing pellets. |
| | ❑ Equip bag-handling stations with vacuum hoses to facilitate spill cleanup. |
| | ❑ Use tarps or containment devices to collect pellets as they are spilled. |
| | ❑ Install grating at doorways for wiping feet. |
| | ❑ Modify loading systems so that transfer lines can be completely emptied, with any residual resin being contained when loading ceases. |
| | ❑ Ensure equipment is secured and stored properly. |
| Operations | ❑ Place portable screens underneath connection points when making and breaking all connections. |
| | ❑ Secure outlet caps and seals before moving full or empty rail hopper cars and trucks. |
| | ❑ Implement handling procedures that minimize punctures and pellet spillage. |
| | ❑ Inspect pellet packaging before offloading. |
| | ❑ Repair punctured bags immediately. |
| Good housekeeping | ❑ Implement daily and routine housekeeping and spill response procedures. |
| | ❑ Develop standard operating procedures for containing and cleaning up spills. |
| | ❑ Conduct routine inspections for the presence of loose pellets on the facility grounds, including parking lots, drainage areas, driveways, etc. |
| Packaging | ❑ Use reinforced bags and containers lined with puncture-resistant material. |
| | ❑ Minimize the use of valved bags or seal valved bags immediately after filling. |
| | ❑ Use sealed containers instead of break bulk packaging. |
| Shipping | ❑ Use containers for cargo shipping rather than individual pallets. |
| | ❑ Identify the person responsible for sealing the ports on rail hopper cars and bulk trucks, and document sealing. |
| | ❑ Close and secure the rail hopper car valve with strong wire or aircraft cable in addition to the normal sealing mechanism. |
| | ❑ Visually confirm that each compartment and tube of shipping vehicles is empty. |
| | ❑ Inspect interiors of trailers and sea containers for defects that may puncture pellet packaging. Consider vandalism exposure when selecting leased track sites. |

EXHIBIT B Page 7 of 9

*Table 2.  BMPs for Potential Pollutant Sources at Rubber, Miscellaneous Plastic Products, and Miscellaneous Manufacturing Facilities (continued)*

| Pollutant Sources | BMPs |
|---|---|
| Shipping (continued) | ❑ Avoid on-deck pellet storage. |
| | ❑ Seal empty rail hopper cars and bulk trucks before returning them to shipper. |
| Recycling and waste disposal | ❑ Store waste pellets in properly labeled containers. |
| | ❑ Recycle or resell waste pellets. |
| | ❑ Check broken and discarded packaging for residual pellets. |
| | ❑ Inspect handling and storage procedures. |
| | ❑ If an outside vendor is used for waste removal, train in material handling, spill prevention and control. |

## What if activities and materials at my facility are not exposed to precipitation?

The industrial stormwater program requires permit coverage for a number of specified types of industrial activities. However, when a facility is able to prevent the exposure of ALL relevant activities and materials to precipitation, it may be eligible to claim no exposure and qualify for a waiver from permit coverage.

If you are regulated under the industrial permitting program, you must either obtain permit coverage or submit a no exposure certification form, if available. Check with your permitting authority for additional information as not every permitting authority program provides no exposure exemptions.

## Where do I get more information?

For additional information on the industrial stormwater program see
**www.epa.gov/npdes/stormwater/msgp**.

A list of names and telephone numbers for each EPA Region or state NPDES permitting authority can be found at **www.epa.gov/npdes/stormwatercontacts**.

## References

Information contained in this Fact Sheet was compiled from EPA's past and current Multi-Sector General Permits and from the following sources:

◆ City of Phoenix, Arizona, Street Transportation Department, Stormwater Management Section. 2004. Prevent Storm Water Contamination Best Management Practices for Section Y - Rubber, Plastic Products & Miscellaneous Manufacturing. Major Groups 30 and 39 (Except 3910-19). **http://phoenix.gov/STREETS/rubplas.pdf**

◆ U.S. EPA, Office of Air and Water Programs - Effluent Guidelines Division.1974. Development Document for Effluent Limitations Guidelines and New Source Performance Standards for the Tire and Synthetic Segment of the Rubber Processing Point Source Category. EPA-820-B-80-100.

◆ U.S. EPA, Office of Science and Technology. 1999. Preliminary Data Summary of Urban Stormwater Best Management Practices. EPA-821-R-99-012 **www.epa.gov/OST/stormwater/**

EXHIBIT B Page 8 of 9

◆ U.S. EPA, Office of Water. 1992. Plastic Pellets in the Aquatic Environment: Sources and Recommendations. EPA 842/B-92/010.

◆ U.S. EPA, Office of Wastewater Management. *NPDES Stormwater Multi-Sector General Permit for Industrial Activities (MSGP)*.
   **www.epa.gov/npdes/stormwater/msgp**

EXHIBIT B Page 9 of 9